No. 119,201

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WILLIAM F. HEFNER,
*Appellee*,

v.

CHRIS A. DEUTSCHER, CHARLES O. ROTTINGHAUS, AND
DRS. DEUTSCHER & ROTTINGHAUS, OPTOMETRISTS, P.A., (F/K/A
DRS. DEUTSCHER, HEFNER & ROTTINGHAUS, OPTOMETRISTS, P.A.,
*Appellants*.

SYLLABUS BY THE COURT

1.

The most important rule when interpreting written contracts is to ascertain the parties' intent through the plain language of the written contract if possible. The law favors reasonable interpretations over absurd interpretations of a written contract.

2.

The doctrine of anticipatory breach requires a complete renunciation of the person's obligation under a contract before performance of the contract is due. Because an anticipatory breach requires a complete renunciation of the person's obligation under a contract, an anticipatory breach is considered a completed breach of contract under Kansas law.

3.

A threatened breach of contract as stated under the parties' employment contract is something distinct from a completed breach of contract. Moreover, the phrase "threatened breach of contract" includes a broad range of acts that communicate or express an intent to violate the employment contract.

4.

In this case, the phrase "threatened breach of contract" as stated in the parties' employment contract is not equivalent to the doctrine of anticipatory breach.

5.

An order of summary judgment is appropriate only when no material facts are in dispute. When determining the existence of material facts in dispute, a trial court must resolve all facts and inferences in the nonmoving party's favor.

6.

In this case, whether the moving party threatened to breach his employment contract by obtaining a tradename and searching for future office space constituted a material fact in dispute.

Appeal from Shawnee District Court; TERESA L. WATSON, judge. Opinion filed April 10, 2020. Reversed and remanded with directions.

*Charles T. Engel* and *Derek D. Ulrich*, of Engel Law, P.A., of Topeka, and *Jay F. Fowler* and *Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, for appellants.

*Roger N. Walter*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, for appellee.

Before HILL, P.J., GREEN and WARNER, JJ.

GREEN, J.: This litigation arises out of the termination of William F. Hefner from a corporation of optometrists for threatening to breach the noncompete clause of his employment agreement with the corporation. Hefner, Chris A. Deutscher, and Charles O. Rottinghaus were all optometrists who practiced together as Drs. Deutscher, Hefner & Rottinghaus, Optometrists, P.A. (The Corporation). When the Corporation refused to pay

2

Hefner for his stock and other interests in the Corporation, Hefner sued the Corporation, Deutscher, and Rottinghaus for breach of his employment and redemption agreements and for wrongful termination. He also sued Deutscher and Rottinghaus individually for breach of fiduciary duty.

The trial court considered the parties' competing motions for summary judgment. It dismissed Hefner's wrongful termination claim; it granted Hefner's request for summary judgment on his breach of contract claim; and it denied Deutscher and Rottinghaus' motion for summary judgment on Hefner's breach of fiduciary duty claim. The trial court sitting without a jury ruled that Deutscher and Rottinghaus had breached their fiduciary duty to Hefner and determined that the Corporation, as well as Deutscher and Rottinghaus, individually, owed Hefner $1,175,551.87 in damages.

The Corporation, Deutscher, and Rottinghaus appeal, arguing that the trial court wrongly granted Hefner's summary judgment motion on his breach of contract claim. They argue that the trial court misinterpreted key language in Hefner's employment agreement and weighed disputed material facts against them. They also argue that the trial court miscalculated its award of damages. Moreover, Deutscher and Rottinghaus argue that they did not breach any fiduciary duty to Hefner. They also argue that the trial court erred in holding them individually responsible for Hefner's damages.

The ultimate question is whether the trial court properly granted Hefner's summary judgment motion in his breach of contract claim. Because we conclude that the trial erred in granting summary judgment in favor of Hefner on this claim, we reverse. Additionally, because the trial court's breach of fiduciary duty and damages award rulings hinged on the trial court properly granting summary judgment on Hefner's breach of contract action, we reverse those decisions as well and remand for a new trial.

3

*Uncontroverted Facts*

In 1998, Hefner began practicing optometry with Deutscher. Later, Rottinghaus joined their optometry practice. Together, they formed the Corporation. Deutscher and Hefner each owned 40% of the Corporation's stock. Rottinghaus owned the remaining 20% of the Corporation's stock. Deutscher served as the Corporation's president while Hefner served as the Corporation's director. Rottinghaus had no official position within the Corporation.

As an employee of the Corporation, Hefner signed an Employment Agreement and a redemption agreement with the Corporation. Those instruments governed the terms of his employment. Subparagraph 14(a) of Hefner's Employment Agreement barred Hefner from competing with the Corporation within Shawnee County, Kansas, or its contiguous counties during his employment and for three years following his employment with the Corporation. Subparagraph 14(d) of Hefner's Employment Agreement allowed the Corporation to seek injunctive relief or any other relief "granted to [the] Corporation by law or under [the Employment Agreement] or other agreements" for "any breach or threatened breach by Hefner of the provisions of [] paragraph 14." Additionally, under the terms of Hefner's redemption agreement, if he breached any of his duties under the employment agreement, the Corporation could terminate him without repurchasing his stock and other interests in the Corporation. The redemption agreement stated that under those circumstances, Hefner agreed "to transfer all [of] his stock and other interests in [the] Corporation and its business to [the] Corporation for no further consideration."

During Hefner's employment, Deutscher and Hefner's relationship soured. And sometime in September 2016, Deutscher and Hefner agreed that Hefner should leave the Corporation. So, Deutscher, acting on behalf of the Corporation, and Hefner began negotiating Hefner's exit agreement.

4

On October 14, 2016, Hefner first proposed two alternative exit agreements: Under the first proposal, the Corporation or Deutscher and Rottinghaus, individually, would buy Hefner's shares in the Corporation for $100,000 and buy Hefner's remaining interests in the Corporation for $750,000. Under this proposal, Hefner would abide by the three-year noncompete clause in his employment agreement. Under the second proposal, the Corporation would buy Hefner's shares in the Corporation for $100,000 but release Hefner from complying with the three-year noncompete clause in his employment agreement.

Five days later, on October 19, 2016, Deutscher tentatively accepted Hefner's second proposal. The Corporation would buy Hefner's shares in the Corporation for $100,000 and release Hefner from the noncompete clause. Deutscher's acceptance was conditioned on a successful negotiation of a written exit agreement.

That same day, the parties began negotiating specific dates for the termination of Hefner's employment. Deutscher first proposed that the Corporation terminate Hefner's employment and release Hefner from his noncompete clause on December 1, 2016. Deutscher also suggested that Hefner sign the exit agreement on November 1, 2016. On October 24, 2016, however, Hefner submitted a counterproposal. He proposed that the Corporation release him from his noncompete clause on December 1, 2016, while still employing him through March 31, 2017. Hefner also suggested that the parties execute the exit agreement on November 1, 2016. But Deutscher had additional concerns about Hefner's counterproposal. As a result, on November 11, 2016, Deutscher made certain suggestions regarding those concerns. He also agreed to Hefner's proposed amended timeline. This would release Hefner from his noncompete clause on December 1, 2016, and terminate Hefner's employment with the Corporation on March 31, 2017. Deutscher then suggested that he and Hefner execute the exit agreement on November 21, 2016.

5

Meanwhile, Hefner began considering his future employment. Around October 28, 2016, Hefner and a real estate agent looked at potential office spaces in Shawnee County for a new optometry practice. On November 29, 2016, Hefner applied for the tradename "Hefner Family Vision, LLC" with the Kansas Optometry Board (Board), using his home address in Topeka as the practice location. Deutscher discovered that Hefner had applied for the tradename that same day when a member of the Kansas Optometrist Association, who had read the agenda for the Board's upcoming meeting, called the Corporation's office. The next day, at the Board's November 30, 2016 meeting, the Board approved Hefner's tradename application.

Hefner never executed an exit agreement with Deutscher. Instead, on December 7, 2016, Hefner submitted a formal letter of resignation with the Corporation. In his letter, Hefner stated that he would continue to work as an employee of the Corporation for six months as required under his employment agreement. He also stated that he would tender his stock and other interests in the Corporation upon the Corporation's repurchase of his stock as stated in his redemption agreement. But Hefner never explained to the Corporation why he was resigning instead of finalizing the previously agreed to exit agreement.

Unbeknownst to the Corporation, starting on November 9, 2016, Hefner had started interviewing with optometry schools for employment as a teacher. Thus, Hefner was considering practicing in Shawnee County and becoming a teacher at the same time. According to Hefner, he decided that he wanted to teach instead of practicing optometry on December 4, 2016; this decision precipitated his resignation on December 7, 2016. Hefner e-mailed a Board member that he would not be needing his tradename on January 3, 2017.

After resigning, Hefner continued to work for the Corporation for a month. Then, on January 7, 2017, Deutscher, acting on behalf of the Corporation, terminated Hefner's

6

employment for violating the noncompete clause of his employment agreement. Deutscher cited Hefner's application for a tradename as evidence he violated the noncompete clause. Deutscher asserted that Hefner's violation required him to "transfer all of [his] stock and other interests in the Corporation and its business to the Corporation for no further consideration" as stated in Hefner's redemption agreement.

About a month after Hefner's termination, the Corporation changed its name to "Drs. Deutscher & Rottinghaus, Optometrists, P.A." Shortly afterwards, Hefner received an offer to teach optometry. He accepted this offer sometime in March 2017.

*Hefner Sues*

Hefner sued the Corporation for breach of contract and wrongful termination. He also sued Deutscher and Rottinghaus individually for breach of fiduciary duty. For his breach of contract claim, Hefner alleged that the Corporation had violated his employment and redemption agreements when it terminated his "employment prematurely without valid justification" and without repayment of his stock and other interests in the Corporation. For his wrongful termination action, Hefner repeated that the Corporation had terminated his "employment without valid justification" and without repayment of his stock and other interests. Then, for his breach of fiduciary duty claim, Hefner alleged that Deutscher and Rottinghaus had violated their fiduciary duty to him as the Corporation's "majority stockholders and directors" by terminating his employment without cause. Hefner requested $1,469,848 in damages: $164,899 for lost compensation, $1,865 in lost fringe benefits, and $1,303,084 in lost "payment for stock and other interests in Corporation equal to his 40% interest . . . ."

The Corporation, Deutscher, and Rottinghaus jointly answered Hefner's petition. They asserted that they had done nothing wrong because "Hefner's behavior violated

7

paragraph[] 14 of his Employment Agreement and justified termination for cause without prior notice."

*Competing Summary Judgment Motions*

The parties both moved for summary judgment. Hefner requested that the trial court grant his request for partial summary judgment against the Corporation on his claims for breach of contract and wrongful termination. Hefner alleged that the only question before the trial court on his breach of contract and wrongful termination claims was if he "competed with the Defendant Corporation in violation of the Employment Agreement." He argued that there was no basis for the Corporation terminating his employment for cause because he never conducted business in competition with the Corporation. As a result, Hefner argued that the only factual question in dispute was if Deutscher and Rottinghaus breached their fiduciary duty to him and, if so, the amount of damages the Corporation, Deutscher, and Rottinghaus owed him.

The Corporation, Deutscher, and Rottinghaus responded that Hefner's summary judgment argument ignored the provisions of his employment agreement that supported his termination for cause. Specifically, the Corporation, Deutscher, and Rottinghaus argued that Hefner ignored that subparagraph 14(d) of his Employment Agreement. This subparagraph allowed the Corporation to invoke all "rights or remedies granted to [it] by law or under [Hefner's Employment Agreement] or other agreements" if Hefner committed any "breach or *threatened breach*." (Emphasis added.) They further argued that Hefner's tradename procurement and office space search while still in the Corporation's employment, at the very least, constituted a threatened breach of the noncompete clause of Hefner's employment agreement.

In making those arguments, the Corporation, Deutscher, and Rottinghaus contended that the phrase "threatened breach" merely required the Corporation to feel at

8

risk of injury or harm from Hefner's actions. Moreover, the Corporation, Deutscher, and Rottinghaus emphasized that Hefner had not accepted any of the proposed exit agreements when he obtained the tradename and conducted his search for an office space. They cited to their attorney's communications with Hefner's attorney. Based on those communications, both attorneys acknowledged that the proposed exit agreements were not final until the parties had agreed on all terms and had formally executed the agreement. They also argued that only the execution of the exit agreement, not the exit agreement negotiations, released Hefner from his obligation to comply with the noncompete clause in his employment agreement.

The Corporation, Deutscher, and Rottinghaus also relied on the preceding facts and arguments when moving for summary judgment against Hefner. In short, they argued that because Hefner obtained the tradename and looked for an office space while the noncomplete clause remained in effect, Hefner violated the noncompete clause of his employment agreement by associating with another optometry practice in Shawnee County or threatening to do so. As a result, the Corporation, Deutscher, and Rottinghaus maintained that Hefner's breach of contract, wrongful termination, and breach of fiduciary duty claims were unfounded.

On the other hand, Hefner argued that the trial court should deny the Corporation, Deutscher, and Rottinghaus' summary judgment motion. He maintained that "a reasonable interpretation of [the undisputed] facts in light of the environment out of which they arose," i.e., the ongoing exit agreement negotiations, would require summary judgment in his favor. Alternatively, Hefner argued that even if he threatened to breach the noncompete clause, the plain language of subparagraph 14(d) of his Employment Agreement did not release the Corporation from its obligation to pay him in accordance with his redemption agreement. Instead, it allowed the Corporation only the remedy of injunctive relief.

9

The trial court held a hearing on the parties' summary judgment motions. At the hearing, the parties repeated their earlier arguments. Then, the trial court asked the parties several questions, including the following: Was Hefner's wrongful termination claim duplicative of his breach of contract claim? Were material facts still in dispute because the parties' summary judgment arguments required the court to infer the parties' intent? And was the phrase "threatened breach" in subparagraph 14(d) of Hefner's Employment Agreement equivalent to the doctrine of an anticipatory breach of contract?

In response to the trial court's duplicative claims question, Hefner agreed that his breach of contract and wrongful termination claims were identical because both hinged on the Corporation violating identical provisions of his employment and redemption agreements. Concerning the trial court's factual dispute question, Hefner contended that the only remaining dispute was whether the trial court could find that he committed a breach or threatened breach of the noncompete clause based on the undisputed material facts. The Corporation, Deutscher, and Rottinghaus countered that if the court needed to infer Hefner's intent to decide whether he committed a breach or threatened breach, then summary judgment would be inappropriate.

Hefner, in responding to the trial court's question equating the phrase "threatened breach" to the doctrine of an anticipatory breach of contract, initially rejected the trial court's equivalency position that the phrase "threatened breach" had the same meaning as the doctrine of anticipatory breach of contract. But he later agreed that those two legal theories had the same meaning when the trial court told Hefner this argument worked in his favor. The Corporation, Deutscher, and Rottinghaus responded that the trial court needed to look at the plain language of the contract to understand the contract's terms and the parties' intent.

The trial court granted Hefner's motion for partial summary judgment on his breach of contract claim, denied the Corporation, Deutscher, and Rottinghaus' motion for

10

summary judgment in Hefner's breach of contract and fiduciary duty claims, and granted the Corporation, Deutscher, and Rottinghaus' motion for summary judgment in Hefner's wrongful termination claim.

Regarding Hefner's breach of contract claim, the trial court stated:  "The facts material to this claim [were] largely undisputed." It then ruled that Hefner's breach of contract claim hinged on if he violated his employment agreement by threatening to breach the noncompete clause in subparagraph 14(a). The trial court ruled that the phrase "threatened breach" under subparagraph 14(d) was the same or equivalent to the doctrine of anticipatory breach of contract. Based on this determination, the trial court ruled that to violate the noncompete clause, Hefner had to "declare a positive and unequivocal intent to breach" the noncompete clause—the standard for determining if an anticipatory breach of contract has occurred. The trial court then found that procuring a tradename and looking at potential office spaces merely constituted an "exploratory activity" that did not "declare[] a positive and unequivocal intent to breach [the noncompete clause]." Thus, the trial court ruled that Hefner did not breach his employment agreement. And the court then held that the Corporation, Deutscher, and Rottinghaus breached Hefner's employment and redemption agreements for terminating him without cause and refusing to repurchase his stock and other interests in the Corporation.

Also, the trial court dismissed Hefner's wrongful termination claim. It explained that because Hefner alleged that the Corporation violated the same duties in both his breach of contract and wrongful termination claims, the two claims were "one and the same."

Finally, the trial court denied Hefner's motion for summary judgment on his breach of fiduciary duty claim because although it believed "the evidence [was] thin," it found that "material questions of fact about [Deutscher and Rottinghaus'] motives and whether Hefner was terminated for a legitimate business reason" remained in dispute.

11

The trial court explained that Deutscher and Rottinghaus' knowledge when terminating Hefner was "material to whether [Deutscher and Rottinghaus] had a legitimate business reason" for Hefner's termination.

*Bench Trial*

Then, the trial court held a three-day bench trial on Hefner's breach of fiduciary duty claim. The trial court ruled that Deutscher and Rottinghaus had breached their fiduciary duty to Hefner because their motives for terminating Hefner were not made "in fairness and good faith to the [C]orporation." Because Deutscher and Rottinghaus broke their fiduciary duty to Hefner, the trial court ruled that Deutscher and Rottinghaus were personally liable for any damages entitled to Hefner. Then, the trial court ruled that Hefner's expert's testimony on the amount of damages owed was more persuasive than the Corporation, Deutscher, and Rottinghaus' expert testimony. So, it determined that the Corporation, Deutscher, and Rottinghaus owed Hefner a total of $1,175,551.87 in damages.

The Corporation, Deutscher, and Rottinghaus timely appealed.

*Did the Trial Court Err When It Granted Summary Judgment in Favor of Hefner's Breach of Contract Claim?*

On appeal, the Corporation, Deutscher, and Rottinghaus make a two-part argument why the trial court erred when it granted summary judgment in Hefner's favor on his breach of contract claim. First, the Corporation, Deutscher, and Rottinghaus contend that the trial court wrongly determined that the phrase "threatened breach" in Hefner's employment agreement had the same equivalence as the doctrine of anticipatory breach of contract. The Corporation, Deutscher, and Rottinghaus contend that the trial court should have determined the meaning of the phrase "threatened breach" by applying

the plain language of Hefner's employment agreement. They further contend that under the plain language of Hefner's employment agreement, it is readily apparent that a threatened breach encompasses a broader range of conduct than an anticipatory breach of contract. Thus, the Corporation, Deutscher, and Rottinghaus argue that the trial court premised its summary judgment ruling on an errant interpretation of Hefner's employment agreement.

Second, the Corporation, Deutscher, and Rottinghaus maintain that the trial court weighed disputed material facts in Hefner's favor when granting Hefner's summary judgment motion. They argue that whether Hefner threatened to breach the noncompete clause in his employment agreement hinged on Hefner's intent. As a result, they contend that the trial court wrongly made credibility determinations when it granted summary judgment in Hefner's favor.

Hefner counters that the Corporation, Deutscher, and Rottinghaus never objected to the trial court's decision equating the phrase "threatened breach" in his employment agreement to the doctrine of an anticipatory breach of contract. Thus, Hefner alleges that the Corporation, Deutscher, and Rottinghaus' argument about the trial court's interpretation of the phrase "threatened breach" is not properly before this court. Notwithstanding this argument, Hefner also argues that the trial court correctly granted summary judgment on his breach of contract claim because the phrase "threatened breach" and the doctrine of anticipatory breach of contract have the same meaning. He contends that no reasonable interpretation of the facts support that he clearly and unequivocally declared an intention not to comply with the noncompete clause when he obtained a tradename and searched for an office space. Alternatively, Hefner argues that even if he committed a threatened breach of the noncompete clause, the plain language of his employment agreement shows that the Corporation, Deutscher, and Rottinghaus could obtain only injunctive relief. He further argues that nothing in his employment or

13

redemption agreements allowed the Corporation to forfeit his stock and other interests in the Corporation for a threatened breach.

*Standard of Review*

Our Supreme Court has implemented the following standard for reviewing an order granting summary judgment:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied."' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P3d 432 (2018).

Yet, to the extent that the trial court's summary judgment order hinged on interpreting Hefner's employment and redemption agreements, this court exercises de novo review. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). This court also exercises de novo review when considering whether a contract is ambiguous. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013). Whether a party breached a certain provision of a contract, however, constitutes a question of fact. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015).

14

*Preservation*

Before addressing the Corporation, Deutscher, and Rottinghaus' arguments, we must first address a couple of Hefner's contentions. Specifically, we must consider Hefner's contention that any threatened breach of the noncompete clause of his employment agreement allowed the Corporation to seek only injunctive relief. Also, we must address Hefner's contention that the Corporation, Deutscher, and Rottinghaus never objected to the trial court's ruling that the phrase "threatened breach" had the same meaning as the doctrine of an anticipatory breach of contract.

Hefner's contention that any threatened breach of the noncompete clause in his employment agreement allowed the Corporation to seek only injunctive relief is not properly before this court. The trial court did not rely on this argument when it granted summary judgment in Hefner's favor on his breach of contract claim. Instead, the trial court determined that under its interpretation of the phrase "threatened breach" and the facts of the case, Hefner never violated his employment agreement.

If Hefner took issue with the trial court's failure to adopt his argument that the Corporation could seek only injunctive relief against any action for threatened breach, he was required to cross-appeal this issue. Hefner's failure to cross-appeal precludes us from reviewing this issue or any other rulings adverse to Hefner. See *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008) (holding that an appellee's failure to cross-appeal precluded the court from considering issues advocated below but not reached by the trial court).

Regardless, even if Hefner's argument were properly before this court, this argument is at variance with the plain meaning of subparagraph 14(d). Subparagraph 14(d) of Hefner's Employment Agreement states that if Hefner breached or threatened to breach any provisions of paragraph 14, which includes the noncompete clause, the

15

"Corporation shall, in addition to other rights or remedies granted to [the] Corporation by law or under this or other agreements, be specifically entitled to an injunction restraining Hefner from competing . . . ." Subparagraph 14(d) also states that "[n]othing in [] paragraph [14] shall be construed as prohibiting the Corporation from pursuing any other remedies available to [the] Corporation for breach or threatened breach, including recovery of damages from Hefner." So, in addition to the right to injunctive relief, the plain language of subparagraph 14(d) states that the Corporation may use any rights granted to it by law, by the employment agreement, or by any other agreements with Hefner. Thus, despite Hefner's argument to the contrary, the plain language of subparagraph 14(d) of Hefner's employment agreement shows that the Corporation could seek any relief entitled to it by law or by contract for a threatened breach of the noncompete clause. For this reason, Hefner's injunctive relief argument is fatally flawed.

Next, Hefner's argument that the Corporation, Deutscher, and Rottinghaus never objected to the trial court's interpretation of the phrase "threatened breach" is baseless. As correctly noted by the Corporation, Deutscher, and Rottinghaus, the trial court sua sponte interpreted that the phrase "threatened breach" had the same meaning as the doctrine of anticipatory breach of contract while considering the parties' summary judgment motions.

When Hefner agreed with the trial court that the phrase "threatened breach" was equivalent to the doctrine of anticipatory breach of contract, the Corporation, Deutscher, and Rottinghaus countered that the trial court should look to the plain language of Hefner's employment agreement to define the phrase "threatened breach." So, the Corporation, Deutscher, and Rottinghaus explicitly took issue with the trial court's interpretation of the phrase "threatened breach" when it sua sponte suggested that the phrase had the same meaning as the doctrine of anticipatory breach of contract. As a result, the Corporation, Deutscher, and Rottinghaus' challenge to the trial court's interpretation of the phrase "threatened breach" is properly before us.

16

*Defining Threatened Breach*

Having discussed what issues are properly before us, we will consider the Corporation, Deutscher, and Rottinghaus' argument that the trial court misinterpreted the phrase "threatened breach" as used in Hefner's employment agreement. To consider this argument, we must first consider the rules of contract interpretation.

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.' [Citation omitted.]" *Peterson*, 302 Kan. at 104. The law favors a reasonable interpretation of a contract that conforms to the contract's purpose. Absurd interpretations should be avoided. *Waste Connections*, 296 Kan. at 963. This means that when interpreting contracts, courts must construe unambiguous phrases in accordance with their plain, general, and common meanings. *Hall v. JFW, Inc.*, 20 Kan. App. 2d 845, Syl. ¶ 3, 893 P.2d 837 (1995). Additionally, unless language in the contract contains doubtful or conflicting meanings under a reasonable interpretation, courts will determine that a disputed term is unambiguous. *Geer v. Eby*, 309 Kan. 182, 192, 432 P.3d 1001 (2019).

Here, the noncompete clause—subparagraph 14(a) of Hefner's Employment Agreement—required Hefner to agree not to compete with the Corporation "[d]uring employment and during a period of thirty-six (36) months after termination or ceasing of employment for whatever reason or cause." Competition under subparagraph 14(a) included "engag[ing] directly or indirectly, either personally or as an employee, associate, partner, manager, agent, officer, director, stockholder, or otherwise be connected in any manner with the ownership, management, operation or control of any [optometry] business" located in Shawnee County, Kansas, or its contiguous counties.

17

On the other hand, subparagraph 14(d) of Hefner's Employment Agreement outlined the Corporation's remedies against Hefner should he violate the noncompete clause under subparagraph 14(a). Subparagraph 14(d) provided that "*any breach or threatened breach* . . . of the provisions of this paragraph 14" allowed the Corporation "in addition to other rights or remedies granted to [the] Corporation by law or under this or other agreements, be specifically entitled to an injunction restraining Hefner from" competing against the Corporation. (Emphasis added.) Then, subparagraph 14(d) modified what actions constituted a violation of Hefner's noncompete clause. Thus, a breach or a threatened breach of the noncompete clause would constitute a violation.

Here, the real conflict revolved around the meaning of the phrase "threatened breach." Specifically, the trial court ruled that the phrase "threatened breach" under subparagraph 14(d) of Hefner's employment agreement was equivalent to the doctrine of an anticipatory breach of contract. The trial court seemingly made this comparison because no provision of Hefner's employment agreement or redemption agreement expressly defined the phrase "threatened breach." But the trial court never attempted to interpret the phrase "threatened breach" in conjunction with the plain language of subparagraph 14(d). Under our rules of contract interpretation, this was the first step the trial court should have taken to determine the phrase's meaning. See *Geer*, 309 Kan. at 192.

Thus, we must consider the meaning of the phrase "threatened breach" under its common meaning. Then, assuming the phrase's common meaning is unambiguous, we must compare the phrase "threatened breach" under its common meaning to the doctrine of anticipatory breach of contract. If the two are not legally equivalent, then the trial court erred.

Black's Law Dictionary defines "breach" as "[a] violation or infraction of a law, obligation, or agreement, [especially] of an official duty or a legal obligation, whether by

18

neglect, refusal, resistance, or inaction." Black's Law Dictionary 232 (11th ed. 2019). So, to "breach" the noncompete clause Hefner must have *actually* "engaged directly or indirectly, either personally or as an employee, associate, partner, manager, agent, officer, director, stockholder, or otherwise be connected in any manner with the ownership, management, operation or control of any [optometry] business" located in Shawnee County, Kansas, or its contiguous counties.

Black's Law Dictionary defines "threat" as "[*a*] *communicated intent* to inflict harm or loss on another or on another's property; a declaration, *express or implied*, of an intent to inflict loss or pain on another." (Emphases added.) Black's Law Dictionary 1783 (11th ed. 2019). Webster's Dictionary defines "threat" as "[*a*]*n expression of an intention* to inflict something harmful." (Emphasis added.) Webster's II New Riverside University Dictionary 1205 (1984). And it defines "threaten" as "[t]o express a threat against," "[t]o serve as a threat," "[t]o give signs or warning of," or "[t]o announce as possible." Webster's II New Riverside University Dictionary 1205 (1984).

The Corporation, Deutscher, and Rottinghaus ask us to interpret the term "threaten" as "causing someone to feel vulnerable or at risk." Hefner counters that we should interpret the term "threaten" as "to utter threats against" or "to announce as intended or possible." As a result, both parties agree that a threat includes an intent to do harm. But the parties disagree on what acts can convey that intent. The Corporation, Deutscher, and Rottinghaus want us to interpret the term "threaten" as including a broad range of activities while Hefner wants us to interpret the term "threaten" as requiring an explicit oral statement of an intent to harm.

A review of the definitions of the term "threat" and "threaten" indicate that although threats may be oral, they do not have to be. The terms "communicate" and "express" as used in the Black's Law Dictionary definition of "threat" and Webster's Dictionary definition of "threat," respectively, have broad meanings. People may

19

communicate or express ideas in several ways, which do not always involve an oral statement. Indeed, in the context of criminal law, our Supreme Court has recognized that criminal threats may be communicated through nonverbal actions. See *State v. Howell & Taylor*, 226 Kan. 511, 515, 601 P.2d 1141 (1979) (holding that the term "communication" in the criminal threat statute included physical acts establishing the defendant's intent), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Under the Black's Law Dictionary and Webster's Dictionary definitions, the key to determining whether an act constitutes a threat is if the act shows an intent to harm. Thus, under the dictionary definitions of the term "threaten," even subtle physical acts could constitute a threat if evidence existed showing that a person intended to cause harm through those subtle acts.

Although Hefner disagrees with the Corporation, Deutscher, and Rottinghaus' suggested interpretation of the term "threaten," Hefner never argues that the term "threaten" is ambiguous. Instead, he argues that there is no reason to adopt a broader definition of the term "threaten" than a narrower definition of the term "threaten." Yet, Hefner's argument ignores that if a term has a commonly understood meaning, then courts must interpret that term under its common meaning. Under the common meaning of the term "threaten," a range of actions may communicate or express an intent to harm.

Besides, Hefner's argument ignores that Subparagraph 14(d) of his employment agreement was drafted to protect the Corporation's interests. Because subparagraph 14(d) was drafted to protect the Corporation's interests, it would be unreasonable to interpret the word "threaten" as used in the phrase "threatened breach" to have a narrower meaning. Using a narrower definition of the term "threaten" would expose the Corporation to greater risk. Moreover, adopting a narrow definition of the term "threaten," would violate the rule favoring a reasonable interpretation of a contract that conforms to the contract's purpose. *Waste Connections*, 296 Kan. at 963.

20

So, the terms "threaten," and "breach" are unambiguous and have a commonly understood meaning. We believe a "threatened breach," in general, can be summarized as follows: A threatened breach includes an act or set of circumstances that would lead a party to reasonably believe that a breach of contract, although not having yet occurred, is imminent and is likely to occur or happen. This act or set of circumstances can be proved by verbal, oral, or physical action.

Conversely, an anticipatory breach, also known as an anticipatory repudiation, requires "a clear and unequivocal refusal to perform" a contractual obligation. *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 408, 77 P.3d 130 (2003). The person committing the anticipatory breach must refuse to perform his or her contractual obligation before performance is due. *Barnett v. Oliver*, 18 Kan. App. 2d 672, 683, 858 P.2d 1228 (1993). This refusal constitutes a complete renunciation of the person's obligation. *Ricketts v. Adamson*, 483 U.S. 1, 17, 107 S. Ct. 2680, 97 L. Ed. 2d 1 (1987). Moreover, because an anticipatory breach involves a clear and unequivocal refusal to perform, Kansas courts consider an anticipatory breach a completed breach of contract. See *Hawkinson v. Bennett*, 265 Kan. 564, 602, 962 P.2d 445 (1998).

Hence, it is readily apparent that the phrase "threatened breach" under the phrase's plain, general, and common meaning is distinguishable from an anticipatory breach of contract. First, although a threatened breach may be established by a broad range of acts that communicate or express an intent to violate the employment agreement, an anticipatory breach requires evidence of a clear and unequivocal refusal to perform. Thus, the definition of an anticipatory breach is narrower than the definition of a threatened breach.

Second, an anticipatory breach includes a timing element—a person commits an anticipatory breach by showing an intention not to perform before performance of the contract is due. In other words, the repudiation often occurs when performance is not yet

21

due. The timing requirement exists because anticipatory breaches often involve buyer-seller or service contracts. In the context of Hefner's employment agreement, however, there was no specific date when his performance was due. Indeed, Hefner had a continuing obligation to perform as an optometrist for the mutual benefit of him and the Corporation. As a result, he was bound to comply with the provisions of his employment agreement throughout the duration of his employment agreement.

Third, an anticipatory breach is a completed breach of contract under Kansas law. Nevertheless, the plain language of subparagraph 14(d) shows that a threatened breach is not a completed breach of the employment contract because it implies that there has not been a positive or unequivocal refusal to perform the terms of the employment agreement. The disjunctive "or" between "any breach" and "threatened breach" shows that when the employment agreement was drafted, the drafters intended for a threatened breach to mean something other than a completed breach of the employment agreement. Thus, this disjunctive proposition (completed breach or threatened breach) expresses a choice, or an alternative, between two things which cannot both be the case if they are a true disjunction.

Fourth, the trial court's comparison of the phrase "threatened breach" to the doctrine of an anticipatory breach of contract ignored that the phrase "threatened breach" is common language in employment contracts. In fact, language that is similar to subparagraph 14(d)'s language is included in the "Employment Agreement" template in Business Transactions Solutions by Alan S. Gutterman. See Business Transactions Solutions § 166:201 (2020). Moreover, there have been many cases concerning whether employees threatened to breach their employment contracts. None of the cases we found during our research equated the phrase "threatened breach" as used in an employment agreement to the doctrine of an anticipatory breach of contract. See, e.g., *Matter of Udell*, 18 F.3d 403, 409 (7th Cir. 1994) (holding that a threatened breach as stated in noncompete clause meant a "present act," i.e., an existing threat); *McLain v. Nursefinders*

22

*of Mobile, Inc.*, 598 So. 2d 853, 853 (Ala. 1992) (in malicious prosecution case, holding that former employer had probable cause to sue former employee for injunctive relief for employee's threatened breach of noncompete clause after employee indicated to employer that she was interested in working for a direct competitor); *Naegele v. Biomedical Sys. Corp.*, 272 S.W.3d 385, 391 (Mo. Ct. App. 2008) (holding that an employee did not threaten to breach her noncompete clause after engaging in fact specific analysis about whether the disputed act constituted a threatened breach); *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 7, 369 A.2d 1164 (1977) (enforcing a noncompete clause for a continued threatened breach because "[i]t is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation . . ."); see also *The Mastro Grp., LLC v. Am. Rest. Enterprises, Inc.*, No. 1 CA-CV 06-0456, 2008 WL 4017948, at *5 (Ariz. Ct. App. 2008) (unpublished opinion) (distinguishing between a restaurant's claim for threatened breach of a noncompete clause from its anticipatory breach of contract claim).

In short, the trial court's determination that the phrase "threatened breach" was legally equivalent to anticipatory breach contains critical flaws. For example, an anticipatory breach is often referred as a completed breach of contract when a promisee or promisor expresses a clear and unequivocal intent to no longer perform by the terms of contract before performance is due. And we also note that neither party pleaded an anticipatory breach of contract in their pleadings before the trial court.

Moreover, under the common meaning of the phrase "threatened breach" in Hefner's employment agreement, a person must simply engage in some act that communicates or expresses an intent to violate the employment agreement. As a result, the phrase "threatened breach" includes a broader range of conduct than the doctrine of an anticipatory breach of contract. Hefner's subtle acts may establish his intent to violate his employment agreement. But those same subtle acts would fail to show that Hefner clearly and unequivocally intended to no longer perform his contractual obligations under

23

his employment agreement to the degree necessary to establish a valid anticipatory breach of contract action.

Finally, this would mean that the evidentiary burden of proof for establishing a valid anticipatory breach of contract action is significantly higher than the evidentiary burden of proof for establishing a valid threatened breach action under Hefner's employment agreement. So, the trial court erred in imposing this obviously higher evidentiary burden of proof on the Corporation, Deutscher, and Rottinghaus, for example, requiring them to prove that Hefner had committed an anticipatory breach of his employment agreement, in defending themselves against Hefner's motion for summary judgment in his breach of contract action.

*Breach of Contract Finding*

On appeal, the Corporation, Deutscher, and Rottinghaus argue that the trial court failed to comply with our Supreme Court's rules on deciding summary judgment motions. They argue that the trial court wrongly interpreted Hefner's intention behind obtaining the tradename and searching for an office space in Hefner's favor. They also argue that the trial court made findings on disputed material facts.

In its order granting Hefner summary judgment on his breach of contract claim, the trial court began its analysis by noting that "[t]he facts material to [the] claim [were] largely undisputed." The trial court then made the following findings: (1) That Hefner's act of applying and obtaining a tradename and searching for an office space were "exploratory activities"; (2) that Hefner never considered breaching the noncompete clause because Hefner's "exploratory activities" occurred when he was negotiating the exit agreement from the Corporation; and (3) that when Hefner failed to check a box on his tradename application—a box Hefner was required to check and which certified that

24

he intended to practice optometry under the requested tradename—this meant that Hefner never considered breaching the noncompete clause.

Based on the preceding findings by the trial court, it is readily apparent that the trial court erred when it granted summary judgment in Hefner's favor on his breach of contract action. To begin with, whether Hefner committed a threatened breach of the noncompete clause of his employment agreement was a question of fact. See *Peterson*, 302 Kan. at 104 (holding that whether a party breached his or her contract constitutes a fact question). Obviously, an allegation of a "threatened breach" is fact specific. And our research has revealed no bright-line rule as to what necessarily constitutes a "threatened breach." As a result, the trial court could not have properly granted summary judgment in Hefner's favor in his breach of contract action unless all the material facts were undisputed. See *Patterson v. Cowley County*, 307 Kan. 616, 621, 413 P.3d 432 (2018) (holding that summary judgment is appropriate in cases only where no material facts are disputed). Yet, at the beginning of its analysis, the trial court noted, "[t]he facts material to [Hefner's] claim [were] largely undisputed."

It necessarily follows that if the material facts were largely undisputed, there must have been some material facts that were not entirely undisputed. Thus, the trial court implicitly conceded that it used flawed reasoning when it granted summary judgment in favor of Hefner—by explicitly acknowledging that there were some material facts still in dispute on an issue involving a question of fact.

Also, when ruling on summary judgment motions, a trial court must resolve all facts and inferences in the nonmoving party's favor. *Patterson*, 307 Kan. at 621. Even so, the trial court clearly resolved the disputed material facts in Hefner's favor. The trial court found that Hefner's "exploratory activities" of obtaining a tradename and searching for an office space constituted innocent actions on Hefner's part because of the parties' ongoing exit agreement negotiations. Nevertheless, Hefner's intention when engaging in these

25

"exploratory activities" was the key material fact in dispute. The Corporation, Deutscher, and Rottinghaus' defense hinged on whether Hefner's "exploratory activities" showed an imminent or likely intent to violate the noncompete clause through those activities. So, when the trial court ruled that Hefner had innocent intentions when engaging in those "exploratory activities," the trial court resolved the central disputed material fact in this case in Hefner's favor.

Moreover, in resolving this disputed material fact, the trial court made credibility determinations regarding Hefner's intent in Hefner's favor. Again, the trial court ruled that Hefner's "exploratory activities" constituted innocent behavior given the ongoing exit agreement negotiations. It also determined that Hefner's failure to check a box on his tradename application that he would use the requested tradename showed that Hefner never intended to violate the noncompete clause.

But Hefner's actions could also be interpreted against him. Hefner plainly knew that he had not been released from the noncompete clause because he was actively requesting his release from the noncompete clause as part of his exit agreement negotiations. Regardless of whether Hefner checked the box indicating that he would use his requested tradename, K.A.R. 65-9-2 required Hefner to certify that he "intend[ed] to actively engage in the practice of optometry under the trade or assumed name upon obtaining approval from the board." Notwithstanding the preceding, it is possible that Hefner intended to use the tradename but he simply forgot to check the certification box. Thus, a reasonable fact-finder could believe that Hefner acted in bad faith when obtaining the tradename and searching for office space.

Because Hefner's intention behind obtaining a tradename and searching for an office space could be interpreted by a reasonable person in Hefner's favor or against Hefner's favor, the trial court erred when it granted Hefner's summary judgment motion. Indeed, it is because a person's intent is so difficult to gauge that our Supreme Court has

26

warned against granting summary judgment in these cases: "A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires it to determine the state of mind of one or both of the parties." *Hill v. State*, 310 Kan. 490, 520, 448 P.3d 457 (2019). And in this case, it is readily apparent that the parties' dispute over Hefner's intent involves whether he acted in good or bad faith. Previously, our Supreme Court has held that "the fact question of the existence of good or bad faith is peculiarly inappropriate for summary judgment." *Waste Connections*, 296 Kan. at 974.

Lastly, the trial court's summary judgment ruling hinged on an error of fact. In ruling against the Corporation, Deutscher, and Rottinghaus, the trial court found that "[n]either [party] assert[ed] that Hefner operated or could have operated an optometry office out of his home." Nevertheless, at the summary judgment motions hearing, the Corporation, Deutscher, and Rottinghaus made this exact allegation. They explained that optometrists may practice from their homes, noting that Hefner's home was large enough to accommodate an optometry practice. So, the trial court erred in this respect concerning this factual finding.

Because material facts remained in dispute on Hefner's breach of contract claim, only a fact-finder at a bench or jury trial can resolve this issue. As a result, we reverse the trial court's summary judgment order and remand to the trial court to hold a new trial. During this trial, the fact-finder must use the commonly understood meaning of the phrase "threatened breach" to decide whether the Corporation legitimately terminated Hefner for cause because he committed a threatened breach of the noncompete clause of his employment agreement. If the fact-finder decides the Corporation legitimately terminated Hefner for cause, then Hefner's breach of contract claim fails.

*The Corporation, Deutscher, and Rottinghaus' Remaining Arguments*

Next, because the trial court erred by granting summary judgment in Hefner's favor on his breach of contract claim, we must reverse the trial court's breach of fiduciary duty finding and damages award.

Reversed and remanded for a new trial.